NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-865

COMMONWEALTH

vs.

JONUEL CARATTINI.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The defendant, Jonuel Carattini, appeals from convictions of drug and firearm offenses, from the orders denying his motions for a new trial, and from the order denying his motion for reconsideration of the second motion for a new trial.  He argues that a new trial is warranted because the prosecutor improperly elicited evidence of the defendant's postarrest silence and presented police testimony that was demonstrably false.  The defendant contends that those improprieties were compounded by the prosecutor's closing argument, and their cumulative effect requires reversal of the convictions.  The judge who presided at trial also ruled on the motions for a new trial, after conducting an evidentiary hearing on each motion.[1]

---

[1] The same judge also denied the defendant's motion for reconsideration.

She concluded that those issues, either individually or cumulatively, were not grounds for a new trial.  We affirm.

Background.  The jury could have found as follows.  On July 21, 2013, Lawrence police received a report of shots fired at an apartment building.  There, medical personnel found Angel Miranda, who had been shot in the foot.  From another victim on the sidewalk, a blood trail led to the second-floor apartment.  Detective Kevin Nigohosian telephoned the defendant, who lived in that apartment but was then in Florida, and informed him that police were investigating a shooting.[2]

In the early morning of July 22, police executed a search warrant at the apartment, seeking evidence of the shooting.  In the living room were signs of a struggle.  From the defendant's bedroom, police seized ammunition found in a drawer.  From a closet in that bedroom, police seized a bullet-proof vest and a locked safe.  In another bedroom, police found a duffel bag in a closet and from it seized documents and a wallet belonging to Miranda.

In the early morning of the next day, July 23, Sergeant Joseph Beaulieu and Officer Tim Yerian responded to the apartment because the defendant and his wife had reported a

---

[2] Detective Nigohosian obtained the defendant's telephone number from Samuel Rosa, who arrived at the crime scene and told police that the defendant had sent him to retrieve the defendant's dog.

2

breaking and entering.[3]  Either the defendant or his wife told the officers that among the items missing was a safe containing between $5,000 and $8,000.  Sergeant Beaulieu explained that police had the safe.  The defendant told the officers that other people had access to the apartment.

At about 3 A.M. on the following day, July 24, police executed another search warrant at the apartment, now seeking Miranda, for whom they had an arrest warrant.  In a closet, police found another man.  Also in that closet were a digital scale and an open bottle that was labeled as containing a dietary supplement but in fact contained thirty-five grams of heroin.  From the kitchen counter, police seized evidence of drug distribution including a bottle of Inositol (a cutting agent), plastic baggies, the box from the digital scale, and a list of police scanner codes.  The defendant was present, and police arrested him.

Pursuant to a third search warrant, police opened the safe and found a firearm, holster, ammunition, documents bearing the defendant's name, and cash totaling $2,370, sorted into four packets, each wrapped in papers on which were written dollar amounts and recent dates.  The firearm was not consistent with the ballistics evidence from the July 21 shooting.

---

[3] As of then, the defendant and his wife were not yet married. For simplicity, we refer to her as his wife.

The defense theory was that the defendant was unaware of the heroin in the closet or the evidence of drug distribution in the kitchen, and that the firearm and cash had been placed in the safe by others while he was in Florida. The defendant testified that the safe was a "community safe" to which others had access because its combination was posted nearby, but he did not allow anyone to put guns or money in it. The defendant testified that in their July 21 telephone call he had told Detective Nigohosian the names of several people who had access to the apartment. He also testified that on July 23, when he and his wife reported the safe stolen, police did not ask him for its combination. He denied that he or his wife told police that there was cash in the safe.

The jury convicted the defendant of trafficking in eighteen or more grams of heroin, unlawful possession of a firearm, and unlawful possession of ammunition. The defendant filed a motion for a new trial arguing that the prosecutor had improperly cross-examined him about his postarrest silence and elicited false police testimony. After an evidentiary hearing at which the judge heard testimony from the prosecutor and from two officers who had participated in the searches of the apartment, Detective Nigohosian and Sergeant John Dushame, the judge denied the motion. The defendant filed a second motion for a new trial, now alleging that trial counsel was ineffective for not

4

impeaching a detective with a search warrant affidavit.  After another evidentiary hearing at which trial counsel testified, the judge denied that motion and the defendant's motion for reconsideration.  The defendant now appeals.

Discussion.  Because the defendant's arguments on appeal from his convictions largely rest on claims he raised in his motions for a new trial, we focus on his claims in that context. "We review the judge's decision [on a motion for a new trial] only to determine whether there has been a significant error of law or other abuse of discretion" (citation omitted). Commonwealth v. Dobbins, 96 Mass. App. Ct. 593, 598 (2019). "Where a judge conducts an evidentiary hearing, we 'accept the [judge's] findings where they are supported by substantial evidence in the record.'"  Commonwealth v. Jacobs, 488 Mass. 597, 600 (2021), quoting Commonwealth v. Velez, 487 Mass. 533, 540 (2021).  We "extend[] special deference to the action of a motion judge who [as here] was also the trial judge." Commonwealth v. Rosario, 460 Mass. 181, 195 (2011).

1.  Postarrest silence.  The defendant argues, as he did in his first motion for a new trial, that the prosecutor improperly cross-examined him about his failure at the time of his arrest to inform police that other people had access to the safe.  The defendant did not object to that testimony.  In response to the motion the Commonwealth candidly conceded, as it does again in

5

this court, that the prosecutor's questions improperly impinged on the defendant's constitutional right to remain silent. The judge considered whether the error created a substantial risk of a miscarriage of justice, and concluded that it did not.

To begin, we note that the defendant's prearrest statements, or his omissions from them, are not at issue. As mentioned above, the defendant testified that on July 21 he told Detective Nigohosian on the telephone that others had access to the apartment, and that on July 23 when he and his wife reported the safe stolen, police did not ask for its combination. On cross-examination, the prosecutor elicited, without objection, that on July 23 the defendant did not tell police that others had access to the safe. The defendant has not argued, here or in the trial court, that it was improper for the prosecutor to question him about omissions from those prearrest statements to police.

The impropriety occurred after the prosecutor elicited that the defendant had been arrested on July 24. This exchange between the prosecutor and defendant ensued:

Q.: "So is it that point that you told [police] what the code was to the safe?"

A.: "Excuse me?"

Q.: "Did you tell them ever that hey, listen, there was a safe that was taken."

A.: "Yes."

6

Q.: "And multiple people have access to that safe."

A.: "Yes."

Q.: "You told them at the police station?"

A.: "No."

Q.: "You told them the code to the safe?"

A.: "No. I did not."

The defendant did not object.

The defendant argues that because he later objected to the prosecutor's reference in closing to that testimony, the prejudicial error standard should apply to its admission. The argument is unavailing, because after closing arguments the judge offered to "strike" any evidence of what the defendant said at the time of his arrest, but defense counsel declined the offer. In those circumstances, we review the prosecutor's cross-examination of the defendant about his postarrest silence to determine whether a substantial risk of a miscarriage of justice exists. Since the defendant made a tactical decision to decline the judge's offer to strike the testimony or give a curative instruction, "he cannot complain of the judge's failure to take these actions." Commonwealth v. Simmonds, 386 Mass. 234, 242 (1982). Cf. Commonwealth v. Letkowski, 469 Mass. 603, 617 & n.21 (2014) (objection to hypothetical question to defense expert about what arrestee would think about speaking to police did not preserve objection to improper police testimony and

7

closing argument about defendant's postarrest silence).  See Commonwealth v. Fowler, 431 Mass. 30, 41-42 (2000) (objection to testimony on other grounds did not preserve claim that it violated right to remain silent).

"There is no question that, under the fundamental principles of jurisprudence, evidence of a criminal defendant's postarrest, post-Miranda silence cannot be used for the substantive purpose of permitting an inference of guilt." Commonwealth v. Beneche, 458 Mass. 61, 73 (2010), quoting Commonwealth v. Mahdi, 388 Mass. 679, 694 (1983).[4]  See Commonwealth v. Andujar, 57 Mass. App. Ct. 529, 535-536 (2003). In assessing the degree of harm caused by constitutional evidentiary error, courts consider "(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions."  Letkowski, 469 Mass. at 619, quoting Mahdi, supra at 696-697.  Applying those factors, we conclude that no substantial risk of a miscarriage of justice arose.

---

[4] The prosecutor did not put before the jury evidence that the defendant invoked his Miranda rights.  At sidebar, the prosecutor commented that after his arrest the defendant "invoked his right to an attorney."

The premise of the defense was that, as counsel said in his opening, the defendant "was not hiding anything from" the police, and someone else had put the gun and the cash in the safe while he was in Florida.  Cf. Commonwealth v. Jones, 477 Mass. 307, 327-328 (2017) (where defendant elicited "considerable evidence creating the impression of full cooperation with the police," he "open[ed] the door" to evidence that he refused to appear before victim for identification).  The judge found that the evidence of the defendant's constructive possession of the firearm and heroin was "strong." In that context, and where the defendant declined the judge's subsequent offer to strike the testimony, we conclude that the prosecutor's brief questioning of the defendant about his failure to tell the police the combination to the safe after his arrest on July 24, although certainly troubling, was a minor point that did not materially affect the verdict or give rise to a substantial risk of a miscarriage of justice.

2.  "False" testimony.  The defendant contends that the prosecutor elicited false testimony from police in three respects.  Relying on Commonwealth v. Ware, 482 Mass. 717, 725 (2019), he argues that the orders denying his motions for a new trial should be reviewed under the standard governing intentional introduction of "blatantly false" testimony, and thus reversal is required if there is "any reasonable likelihood

9

that the false testimony could have affected the judgment of the jury." Commonwealth v. Gilday, 382 Mass. 166, 177 (1980), quoting United States v. Agurs, 427 U.S. 97, 103 & n.9 (1976). We are not persuaded. After presiding at trial and the two evidentiary hearings, the judge concluded, applying Ware, supra, that police witnesses did not give intentionally false testimony at trial, and the prosecutor did not commit misconduct by failing to correct the testimony or by arguing from it in closing. We defer to the judge's credibility determinations.

a. Inositol and dietary supplement bottles. At trial, Sergeant Dushame testified that evidence of drug distribution that police found on July 24 -- including the Inositol bottle and the dietary supplement bottle containing heroin -- had not been in the apartment during the police search on July 22. The defendant argues that testimony was false because "[c]areful inspection" of photographs of the July 22 search "would have revealed" that they depicted the Inositol bottle in a kitchen cabinet and the dietary supplement bottle on a bedroom floor.[5]

---

[5] The Commonwealth provided those photographs to the defense in pretrial discovery. As depicted in those photographs, the label on the Inositol bottle was facing the wall of the kitchen cabinet. The label on the dietary supplement bottle, which was capped, indicated that its contents were legal to possess. The judge concluded that "it cannot be said for sure" that those were the same bottles as the ones police seized on July 24, but "it is fair to assume that they might be." We have reviewed the July 22 photographs and compared them to photographs of the

10

The defendant further contends that the prosecutor committed misconduct by failing to correct the false testimony.

The judge credited testimony of Sergeant Dushame and Detective Nigohosian that neither remembered seeing the Inositol or dietary supplement bottles during the July 22 search. The judge found that "[n]o one, including the officers, the prosecutor, or the defense attorney, noticed that bottles similar to those seized on July 24, were depicted in the photograph[s] taken during the July 22 search." The judge concluded that Sergeant Dushame did not intentionally offer false testimony. See Commonwealth v. Forte, 469 Mass. 469, 491 (2014) (percipient witnesses who described events differently than as depicted in surveillance video did not offer "objectively false" testimony). Inconsistencies between a witness's testimony and documentary evidence due to factors such as "poor perception" "do not constitute falsities." Id., citing Commonwealth v. Daigle, 379 Mass. 541, 546-547 (1980). Contrast Ware, 482 Mass. at 726 (trooper's testimony that in recorded interview defendant had admitted being picked up near crime scene was "blatantly false and pertained to a critical component of the Commonwealth's case").

bottles admitted at the evidentiary hearing. We concur with the judge's conclusions.

11

Crediting the testimony of the prosecutor that she did not know what the bottles depicted in the July 22 photographs were, the judge also concluded that the prosecutor did not intentionally introduce false testimony.  In those circumstances, we "reject the defendant's contention that the Commonwealth knowingly used false testimony that reasonably could have affected the judgment of the jury."  Forte, 469 Mass. at 491.

b.  Defendant's ownership of safe.  Cross-examined at trial about why he did not have the safe tested for fingerprints, Detective Nigohosian testified that he already "knew" that the safe belonged to the defendant, who had reported it stolen and in whose bedroom closet it was found.  The defendant argues, as he argued in his second motion for a new trial, that that testimony "directly contradict[ed]" Detective Nigohosian's search warrant affidavit averring that the safe would contain evidence of the July 21 shooting.[6]  The defendant contends that because he was in Florida on that date and was not a suspect in the shooting, Detective Nigohosian's testimony was "false" and

---

[6] In that affidavit, Detective Nigohosian averred that there was probable cause to believe that the safe contained evidence of the July 21 shooting, including firearms, ammunition, and "paperwork pertaining to positive identification of ownership." The affidavit did not name any suspect in the shooting, and was not required to do so.  See Commonwealth v. Perry, 489 Mass. 436, 461 (2022) ("a search warrant need not identify a specific criminal suspect" [quotation and citation omitted]).

12

defense counsel was ineffective for not impeaching the detective with the affidavit.  We conclude, as did the judge, that Detective Nigohosian's testimony that he believed the safe belonged to the defendant was not inconsistent with his affidavit averring that there was probable cause that the safe contained evidence of the July 21 shooting.  See Zurcher v. Stanford Daily, 436 U.S. 547, 561 (1978) ("search warrants are often employed early in an investigation, perhaps before the identity of any likely criminal and certainly before all the perpetrators are or could be known").

In any event, crediting defense counsel's testimony, the judge found that counsel "would not, in his professional opinion, have used [the search warrant affidavit] to impeach, where, according to him, he had 'richer soils to till' elsewhere."  See Commonwealth v. Hudson, 446 Mass. 709, 715-716 (2006) (motion judge did not abuse discretion in concluding that counsel's strategic decision not to impeach witness with affidavit was reasonable when made).  Indeed, defense counsel likely did not want to focus the jury on the July 21 shooting, which could be seen as motive evidence of drug dealing.

c.  Police testimony that Miranda was transient.  The defendant argues that police testified falsely that they had information that Miranda was homeless but was sometimes "staying" at the apartment.  The defendant contends that the

13

testimony contradicted information in Sergeant Dushame's affidavit in support of Miranda's arrest warrant, which related that named witnesses had seen Miranda at the apartment on multiple occasions.  The defendant contends that Sergeant Dushame and Detective Nigohosian should have testified that they "had information from multiple witnesses in the building that [the defendant]'s apartment had been Miranda's 'home' for three months."  Putting aside that such testimony would have been hearsay, the defendant has not shown prejudice.  As the judge noted, defense counsel effectively cross-examined both officers about Miranda's access to the apartment.  Further, the defendant himself testified that Miranda was "homeless, basically, so he would be around the property a lot."

3. <u>Prosecutor's closing argument</u>.  The defendant argues that the prosecutor's closing argument was improper in three respects.  The defendant objected only as to the first one, but not on the same grounds he argues on appeal, and he declined the judge's offer of a curative instruction.  In those circumstances, we review the closing argument to determine if a substantial risk of a miscarriage of justice arose.  See <u>Commonwealth</u> v. <u>Dirgo</u>, 474 Mass. 1012, 1016 (2016).

"In closing argument, counsel may argue the evidence and the fair inferences which can be drawn from the evidence." <u>Commonwealth</u> v. <u>Hoffer</u>, 375 Mass. 369, 378 (1978).  "In

14

determining whether impermissible statements in a prosecutor's closing argument require reversal, 'we consider (1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave the jury which may have mitigated the mistake; and (4) whether the error, in the circumstances, possibly made a difference in the jury's conclusions." Commonwealth v. Bois, 476 Mass. 15, 32 (2016), quoting Commonwealth v. Kater, 432 Mass. 404, 422-423 (2000).

a. Reference to postarrest silence. The defendant contends that the prosecutor's closing argument exacerbated the prejudice from her cross-examining the defendant about his postarrest silence. The prosecutor argued:

> "[R]emember when it has been suggested to the police, the first time suggested to the police, there are people in and out of that safe four years later. Never told the police when they're claiming it's stolen, nor at the time of the arrest for the heroin that was found, never said, hey, I'm concerned because I don't know what's in that safe. It's not until they -- four years." (Emphases added.)

Defense counsel objected to the prosecutor's reference to the defendant's silence "at the time of the arrest," repeating that phrase several times and telling the judge that it was "a dead quote" from the prosecutor's closing. At first, defense counsel asked the judge to "strike" any reference to what the defendant said at the time of his arrest. After discussion with the judge

15

about whether the instruction would draw the jurors' attention to the testimony, defense counsel said, "I withdraw my request."

The defendant argues that the prosecutor's references in closing to "four years" were an improper comment on his silence not only at the time of his arrest but for the four years between then and trial.[7]  At trial, the defendant did not raise that objection, ask the judge to strike the words "four years," or request a curative instruction.  After the defendant raised the issue in the first motion for a new trial, the judge considered the words "four years" as susceptible to the interpretation that the defendant had "waited four years to share" information that others had access to the safe.

The judge concluded that the error in the prosecutor's closing did not create a substantial risk of a miscarriage of justice.  The judge noted that defense counsel had pointed out in his closing that the defendant had told police, "that's my safe," and argued, "He'd be the only person who knew what was in there. . . .  Does that sound like someone who's a drug boss, . . . or does that sound like someone . . . who is responding in an innocent manner?"  The judge concluded that because defense counsel had "opened the door to the issue of

---

[7] Police witnesses had testified repeatedly that they were unable to remember details because it had been "four years" since the events occurred.

whether [the defendant] was being honest with police," any harm from the prosecutor's reference to the defendant's postarrest silence was "minimal at best." We discern no error of law or abuse of discretion in the judge's ruling. See Jones, 477 Mass. at 326-327.

b. Reference to Inositol and dietary supplement bottles. Based on officers' testimony about not seeing the Inositol and dietary supplement bottles during the July 22 search, the prosecutor argued in closing that the jury should infer that when the defendant returned from Florida on July 23, he "brought . . . a bottle of Inositol, the [dietary supplement] bottle, and the [thirty-five] grams of heroin." The defendant contends that the argument was based on "false" testimony and thus was prosecutorial misconduct. The judge concluded that, because it was the Commonwealth's theory of the case that the defendant was operating an ongoing drug operation from the apartment, it was "not particularly significant whether or not the two bottles were in the [a]partment before the defendant returned from Florida." We discern no abuse of discretion in her assessment of the impact of that argument.

c. References to unsupported facts. Finally, the defendant argues that the prosecutor injected facts that had no basis in the evidence when she argued in closing that while taking the stolen property report from the defendant and his

17

wife on July 23, Officer Yerian did not "see anything" that evidenced drug distribution. Both Officer Yerian and Sergeant Beaulieu testified that the apartment was in a "shambles" and it looked like a "party" had occurred while the defendant was in Florida. In that context, the inference that the officers did not see evidence of drug distribution was arguably a fair one. See Commonwealth v. Lugo, 89 Mass. App. Ct. 229, 236 (2016), quoting Commonwealth v. Ridge, 455 Mass. 307, 330 (2009) (proper to use "hypothesis" in closing argument). Moreover, the prosecutor's pointing to the absence of visible evidence of drug distribution supported the defense theory that the defendant was unaware that those items were in his apartment, and thus did not prejudice the defendant.

4. Cumulative errors. Finally, the defendant argues that even if no one error, standing alone, is sufficient to warrant the reversal of his convictions, reversal is nonetheless warranted due to cumulative error and a pattern of deliberate

18

misleading.  Given our conclusions on the underlying alleged errors, there was no cumulative error.

Conclusion.  We affirm the judgments, the orders denying the motions for a new trial, and the order denying the motion for reconsideration.

So ordered.

By the Court (Massing, Henry & Grant, JJ.[8]),

Assistant Clerk

Entered:  January 25, 2024.

---

[8] The panelists are listed in order of seniority.